**GULF, MOBILE AND OHIO RAILROAD COMPANY, Plaintiff,**

v.

**UNITED STATES of America, Defendant (two cases).**

Civ. A. Nos. 5662–69, 6332–70.

United States District Court, S. D. Alabama, S. D.

Feb. 18, 1972.

J. N. Ogden, W. H. Sanders, William A. Kimbrough, Mobile, Ala., for plaintiff.

C. S. White-Spunner, Jr., U. S. Atty., Mobile, Ala., Donald B. Craven, Dept. of Justice, Washington, D. C., for defendant.

## ORDER

PITTMAN, Chief Judge.

This cause is now submitted upon defendant's Motion For Partial Summary Judgment and plaintiff's Cross Motion For Partial Summary Judgment.

This court has jurisdiction in this matter pursuant to Section 1346(a) (1) of Title 28 of the United States Code.

On November 8, 1957, and supplemented on November 19, 1957, the plaintiff, Gulf, Mobile and Ohio Railroad Company (hereinafter referred to as "taxpayer") applied to the Interstate Commerce Commission (ICC) for authority to issue five-percent income debentures, Series A, due December 1, 2056, in principal amount not to exceed $28,343,800. The income debentures were to be exchanged on a voluntary basis for up to 283,438¼ shares of taxpayer's issued and outstanding preferred stock, without par value, $5 Series, with a stated value

of $100 per share. The terms of the exchange were one Series A income debenture in principal amount of $100 for one share of preferred stock.

The interest on the income debenture was payable currently, only if earned, and cumulative interest was limited to 15 percent. The preferred stock was without par value and carried a stated value of $100. Dividends on the preferred were payable at the rate of $5 per share per annum when and as declared by the board of directors and were cumulative, subject, however, to certain limitations. The stock was callable at its stated value plus any accumulated and accrued dividends. It was carried on taxpayer's balance sheet at its stated value of $100 per share. At all times here relevant, the preferred stock and income debentures were listed and traded on the New York Stock Exchange. At the date of the exchange the market price for the preferred shares was less than the principal amount of the debentures.

On December 20, 1956, the Interstate Commerce Commission granted plaintiff the authority to issue the income debentures. Pursuant to that order, taxpayer, during the period December 31, 1957, through December 31, 1962, issued a total of 187,116 income debentures in exchange for a like number of shares of preferred stock.[1] The total exchange resulted in a debit of $18,711,600 to the preferred stock account and a corresponding credit to the income debentures account in the same amount.

Subsequently, taxpayer filed claims for refund with respect to its taxable years ended December 31, 1959 and 1961, in which it claimed a refund of taxes based on, among other things, a deduction for amortizable bond discount arising from the exchange of the above debentures. The deduction was computed by taking the total principal amount ($18,711,600) of debentures issued and subtracting therefrom the total market value ($11,869,092.44) of the preferred stock, as determined by the listed price on the New York Stock Exchange. The result, $6,842,507.56 was determined by taxpayer to be the total discount arising from the exchange, which amount was claimed to be amortizable over the life of the debentures. Upon disallowance of these claims, these actions were timely commenced.

The crux of the problem in these cases dealing with bond discount is that there is no statutory treatment of the subject. Section 163 of the Internal Revenue Code of 1954 allows corporations and individuals to deduct all interest paid or accrued within the taxable year. This has been supplemented by Internal Revenue Regulation 1.163–3(a) which provides:

"If bonds are issued by a corporation at a discount, the net amount of such discount is deductible and should be prorated or amortized over the life of the bonds. For purposes of this section, the amortizable bond discount equals the excess of the amount payable at maturity (or, in the case of a callable bond, at the earlier call date) over the issue price of the bond."

It is agreed by the parties that if the bonds had been issued for cash in the amount of the selling price of the preferred stock at the time of the exchange, the discount would be proper and the amortization deduction allowed. Taxpayer contends that the bonds-for-stock situation presented here should be treated the same as bonds-for-cash. The argument is that there is no basis in economic reality for differentiating be-

---

1. The amounts of the exchanges were:

1957—$85,200 in principal amount of income debentures for 852 shares.

1958—$12,653,000 in principal amount of income debentures for 126,530 shares.

1959—$337,800 in principal amount of income debentures for 3,378 shares.

1960—$1,046,300 in principal amount of income debentures for 10,463 shares.

1961—$3,767,300 in principal amount of income debentures for 37,673 shares.

1962—$822,000 in principal amount of income debentures for 8,220 shares.

tween the two transactions. Also, it is pointed out that the same result could have been accomplished in a two-step exchange (bonds for cash; cash for preferred stock) which arguably would have escaped the challenge encountered here. The Government maintains that the bonds-for-stock exchange is an entirely different event than one involving cash and should meet with a different result. The transaction is characterized as a recapitalization within the meaning of Section 368(a) (1) (E) of the Internal Revenue Code of 1954 with the result being a mere reshuffling of the capital structure with no new capital added. The fact that taxpayer's preferred stock account was debited $100 for each share of stock taken in, and the income debenture account credited $100 for each bond that was issued, is cited as proof of the "reshuffling" aspect of the exchange.

In deciding this issue, the court is faced with an apparent conflict of authority. Taxpayer relies upon decisions from the Second, Third and Tenth Circuits as well as several District Court cases. Atchison, Topeka & Santa Fe Railroad Co. v. United States, 443 F.2d 147 (10th Cir. 1971); Nassau Lens Co. v. Commissioner of Internal Revenue, 308 F.2d 39 (2nd Cir. 1962); Montana Power Co. v. United States, 232 F.2d 541 (3rd Cir. 1956); American Smelting & Ref. Co. v. United States, 130 F.2d 883 (3rd Cir. 1942); Claussen's Inc. v. United States, 71–2 U.S.T.C. 9632 (S.D.Ga. July 29, 1971); Cities Service Co. v. United States, 316 F.Supp. 61 (S.D.N.Y. 1970), reaff'd 71–2 U.S.T.C. 9501 (1971); Industrial Dev. Corp. v. United States, 51 A.F.T.R. 1514 (N.D.Ill.1956); Southern Fertilizer & Chem. Co. v. Edwards, 167 F.Supp. 879 (M.D.Ga.1955).

The Government places its emphasis on a line of Court of Claims decisions and a recent Tax Court case. St. Louis-San Francisco Ry. Co. v. United States, 444 F.2d 1102 (Ct.Cl. July 14, 1971);

Missouri Pacific Ry. Co. v. United States, 433 F.2d 1324, 193 Ct.Cl. 257 (1970); Erie Lackawanna Ry. Co. v. United States, 422 F.2d 425, 190 Ct.Cl. 682 (1970); Southern Natural Gas Co. v. United States, 412 F.2d 1222, 188 Ct.Cl. 302 (1969); Montana Power Co. v. United States, 159 F.Supp. 593, 141 Ct.Cl. 620 (1958), cert. denied 358 U.S. 842, 79 S.Ct. 23, 3 L.Ed.2d 76 (1958); National Alfalfa Dehydrating and Milling Co. v. Commissioner, 57 T.C. 46 (1971). A discussion of all the cases in chronological order is thought to be helpful in determining the progression of thinking in the area.

American Smelting & Ref. Co. v. United States, *supra,* was the first definitive holding that an amortization deduction may arise in a case where bonds are issued for property. The Third Circuit allowed as additional interest deductions bond discount measured by the difference between the maturity value of the bonds and the market value of the preferred stock which had been received. The facts of the exchange were similar to these[2] except that the taxpayer received not its own shares in return for the bonds, but those of a wholly-owned subsidiary. The court refused to make the dividing line for bond discount whether the bonds were exchanged for cash or whether they were exchanged for something else. While recognizing "the possibilities of great difficulty in determining with sufficient exactness the difference between the par value of the bonds and the thing other than cash received for the bonds by the obligor," 130 F.2d at 886, the majority determined that in the case before them, the cost of the bonds was the fair market value of the stock at the time the corporate obligations were exchanged. Taxpayer's proof of the fair market value consisted of the selling price of the preferred stock on the New York Stock Exchange at the time of the exchange and

---

2. Taxpayer sought to amortize discount which it claimed had been incurred upon the exchange in 1917 of its 30 year, $100, 5% bonds for 5% and 6% preferred stock of a wholly-owned subsidiary corporation with a par value of $100 per share.

immediately thereafter. Thus, market price was deemed to be sufficient to establish the value of the stock. The dissenting judge disagreed on this point while implicitly concurring with the proposition that bonds-for-stock exchanges could give rise to bond discount if the proof of value was sufficient.

Although *American Smelting* was not cited, the same result was reached in Southern Fertilizer & Chem. Co. v. Edwards, *supra,* one of the two decisions on the issue by District Courts within the Fifth Circuit.[3] Amortization of bond discount was allowed upon a finding that "the evidence amply supports plaintiff's contention that its debenture bonds were issued for a consideration of not more than $75 per $100 face amount of bonds." 167 F.Supp. at 881. However, the issue of proof, regarded as so important in *American Smelting* was not considered because the bonds were stipulated to be worth only 75% of face amount.

The situation where debentures are issued in exchange for the taxpayer's own stock was also considered in Industrial Dev. Corp. v. United States, *supra.*[4] The District Court for the Northern District of Illinois held that the taxpayer's right to bond discount was unaffected by what was received in return. Discount was based on the difference between the face value of the debentures and the market value of the preferred stock. The court ruled that the fact that the debentures were issued in connection with a tax-free recapitalization did not negate bond discount.

Once again, *American Smelting* was not cited and the findings of fact and conclusions of law were made with little discussion.

The Third Circuit, in Montana Power Co. v. United States, *supra,* reaffirmed its ruling in *American Smelting* on its facts. No bond discount was allowed in a bonds-for-property transaction[5] on the basis that the taxpayer had failed to introduce any evidence of the fair market value of the property received. This appears to be consistent with the *American Smelting* holding that the taxpayer bears the burden of establishing the fair market value of that for which the bonds were issued. However, in dicta, the court refused to follow *American Smelting* in the situation of a bonds-for-property exchange. In discussing *American Smelting,* the court stated:

"It is true in commenting on the government's contention [in the *American Smelting* case] we stated that 'we do not think . . . that the question whether amortization is permitted is settled by making the dividing line between transactions in which bonds are issued for cash and transaction where bonds are issued for something else' but that comment must be considered in the light of the specific question presented for determination. The 'something else' in that case was 'preferred stock' of a wholly-owned subsidiary which the taxpayer retired in a recasting of its corporate structure—the issuance of bonds for preferred stock there was in substance a 'funding operation' in which the tax-

---

3. Taxpayer issued cash, noncumulative, preferred stock, scrip and its own debenture bond for each share of its 8% cumulative preferred stock in accordance with a negotiated plan of recapitalization. The debenture bonds issued had a par value of $100 and a market value of $75 per share.

4. The exchange of $140 of debentures plus $10 cash for each share of preferred stock was made pursuant to a plan of statutory merger of taxpayer and a subsidiary corporation. The preferred stock had a par value of $100 per share and a fair market value of $106 per share, at the time of the

exchange. The stock carried cumulative dividends at the rate of, but not exceeding, $7 per share per annum, payable when declared.

5. Taxpayer issued 30 year, 5% debentures with aggregate principal amount of $10,589,900 in a tax-free reorganization for certain natural gas properties. The difference between the tax cost basis of the assets and the principal amount of the debentures was claimed as a bond discount. Both parties to the exchange were almost completely owned by a common third party.

payer substituted for its preferred stock liability its bond liability. There was not in that case the issuance of bonds and attending creation of a liability in a purchase transaction for investment purposes as was true in this case. The *American Smelting* decision in that respect must be limited to its facts." 232 F.2d at 546.

Thus, the court appears to have accepted the bonds-for-stock rationale of *American Smelting*, but refused to extend it to an exchange in which property is received.

The Court of Claims also had occasion to consider a claim for bond discount in a bonds-for-property exchange in Montana Power Co. v. United States, *supra*. In that case, the taxpayer issued 30 year debentures for which it received property valued at less than the face amount of the debentures. The corporation retired the debentures at face amount before the thirty year period and attempted to calculate bond discount as the difference between the principal amount of the debentures and the basis of the assets it had received in exchange. The court sustained the disallowance of the deduction, holding that, as long as the property received for the securities is held, no "loss" can properly be considered as having occurred. Thus, no tax consequences can arise until the gain or loss is realized by a sale of the property. Unanswered was the question of what the tax consequences would be at the time of the sale of the property. The Court of Claims, like the Third Circuit itself, refused to give credence to *American Smelting* in the area of bonds-

for-property exchange. The court did not consider a bonds-for-stock exchange and did not address itself to the issue of whether a retirement of the taxpayer's stock upon its receipt would constitute a "realization" for tax purposes.

The time element of realization was also an important factor when the Second Circuit considered bond discount in a bonds-for-property transaction in Nassau Lens v. Commissioner, *supra*.[6] The court, faced with the contention that bond discount is never available when the obligations are issued for property, thought it important that since the debentures could be redeemed at various times for various amounts, the cost of the property could not be determined until the redemption. This might not occur until long after the property had been resold. The court concluded that bond discount is the cost of using the money which is needed to purchase the property and found no support for the contention that the seller who also becomes a financing medium by accepting bonds should be treated differently than one who takes cash. *American Smelting* was cited with approval while it was recognized that the value of property is more uncertain than the value of cash.

The Court of Claims followed its *Montana Power* decision with very little discussion in Southern Natural Gas Co. v. United States, *supra*.[7] The holding that there can be no tax consequences as long as the property received for the securities is retained was again reiterated. The only factual difference in the cases was that *Montana Power* had involved a tax-free reorganization whereas the

6. Taxpayer transferred 100, 10 year debentures, each with an issuance value of $1,000 and with a principal amount of $1,500. The notes were non-interest bearing and were redeemable prior to maturity at taxpayer's election in accordance with a schedule of payments. Taxpayer also assumed $60,752,740 of liabilities and received in exchange assets valued at $160,752.74.

7. Pursuant to a taxable reorganization instituted under the Bankruptcy Act, taxpayer issued stock and 25 year, 6% bonds

with a par value of $100. In return, taxpayer assumed outstanding first mortgage bonds and received the predecessor's debentures and preferred stock. The fair market value of the assets received was claimed to be $71.50 for each exchange. The Commissioner allowed the amortization for the difference between par value and fair market value. Plaintiff then elected to redeem the bonds at face value before the expiration date and the discount not yet amortized was claimed as a deduction for that year. This was disallowed by the Commissioner.

transaction in *Southern* was a taxable one. The court held that "the *Montana Power* rule was clearly meant to apply to the issuance of bonds for property in either situation." 412 F.2d at 1238. Also, quoting the exact language of *Montana Power*, the court expressly refused to follow *American Smelting* to the extent that the cases were inconsistent.

Another factor of value determination, the amount originally received for the preferred stock by the taxpayer, was interjected into bond discount determination by the Court of Claims in Erie Lackawanna Ry. Co. v. United States, *supra*. On facts similar to the present ones,[8] the court stated:

"The position which this court . . . take[s] . . . is that since plaintiff was exchanging $100 debentures for preferred stock for which it had already received $100 in value, then plaintiff lost nothing as a result of the transaction. Since there was no actual difference between the face value of the debentures and the amount received in return for them ($100 preferred stock), there was no discount which could be amortized over the life of the bonds. The fact that the preferred stock had a market value less than the $100 at the time of the exchange is of no consequence in this type of transaction where the plaintiff is purchasing its own stock. What is important in this case is the

value received for the stock at the time of its issuance." 422 F.2d at 429.

However, it is important to note that the court did not rely on the principal or par value of the preferred stock in determining the value received by the corporation. Instead, it made an express finding that $100 was in fact the amount received at the issuance by the cancellation of $100 worth of debt. The court reserved the question of whether a bond discount would be allowable if the amount originally paid for the preferred stock had been less than $100. In discussing previous decisions, the Court of Claims distinguished the facts of *American Smelting*. It was a "crucial" difference that the exchange there had not involved the corporation's own stock but that of a subsidiary. The reasoning of *American Smelting* was also thought by the court to have been expressly overruled by its previous decisions in *Montana Power* and *Southern Natural Gas*. Similarly, *Industrial Dev. Corp.* and *Southern Fertilizer* were felt to be incorrectly decided and were rejected as authority.

In Cities Service v. United States, *supra*,[9] the District Court for the Southern District of New York accepted the rationale of Erie Lackawanna concerning the importance of purchase price. However, after *American Smelting* and *Nassau Lens*, it was "well settled" in the Second Circuit that bond discount could

8. The holders of taxpayer's 5%, $100 par value, preferred stock, pursuant to an exchange offer approved by the ICC, exchanged 277,762 shares thereof for a like number of 5% debentures in the principal amount of $100. The preferred stock was shown on taxpayers books at full par value and was callable at par plus accrued and unpaid dividends. It was cancelled upon receipt. The total market value of the preferred stock at the time of the exchange was less than the maturity value of the debentures for which the shares of stock were exchanged, and this difference was claimed by taxpayer as bond discount.

9. Taxpayer issued its thirty-year, 3% debentures in the aggregate amount of $115,-246,950. In return, it received all its

outstanding no par preferred preference B and preference BB shares, all rights appertaining thereto and all dividend arrearages thereon. It was stipulated that the three classes of preferred and preference shares were issued by the plaintiff at various times in consideration for cash and properties having an aggregate fair market value at the time of issuance of no more than $45,323,846.00. Further, it was agreed that at the time of the exchange the aggregate fair market value of the preferred and preference shares was $86,313,600.00. Plaintiffs repurchased the debentures at face amount and claimed bond discount for the difference between that amount and either the original purchase price or the fair market value at the time of exchange.

occur in a bonds-for-property transaction. In blending the reasoning of both lines of cases, the court recognized that the conflict was more apparent than real. The difference between the face amount of the bonds issued for property and the market value of the property acquired was bond discount because it represents the cost of the money that would otherwise need to be borrowed in order to make a cash payment for the property received. Further, the court recognized that something other than a "mere reshuffling of assets" had occurred:

> "The effect of the exchange was a radical change in plaintiff's debt obligation. In lieu of a conditional obligation to pay dividends on the preferred and preference shares, depending upon earnings and the management's good faith exercise of its discretionary powers, plaintiff now becomes firmly and unconditionally obligated to pay the face amount of the new debentures plus 3% interest annually on the unpaid balance. . . . The 'expedient' in question, if it can be so called, involved far more than the substitution of currencies urged by the defendant. It involved the assumption of enlarged and unconditional obligations by the plaintiff, as a result of which deductible losses have been realized." 316 F.Supp. at 71.

However, the original consideration of the shares received in the exchange was also recognized as a determinative factor. The court ruled that the minimum amount which could be ascribed to the shares acquired was the original consideration which had been received upon issuance. Having received the cost price upon issuance, the taxpayer could not sustain a loss to a greater extent. The original consideration was only the lowest figure at which the value could be established. The actual value could be determined only after a review of such factors as market value of the shares, the financial condition of the taxpayer at the time of the exchange, the prospects of profits and expert opinion. As a result, the motion for summary judgment was denied and a trial was directed to determine the value of the shares received.

Relying heavily on *Cities Service*, the Court of Claims in Missouri Pacific Ry. Co. v. United States, *supra*,[10] refused to adopt the position that no discount can arise on an exchange of bonds for the old securities of a corporation. It indicated that while the amount received for the old securities which are retired might be the minimal consideration or floor to be ascribed to the securities for purposes of calculating discount, it cannot be the ceiling. No trial was necessary to determine value since it had already been determined in the reorganization proceedings. The court purported to follow its decision in *Erie Lackawanna*. However, market value was not considered "of no consequence" as in *Erie*, but instead was a "factor" which, although not conclusive, was still to be weighed in the analyses. Also, even though *Erie* had found *American Smelting* of no value as authority because of the "crucial" difference that the stock received there had been that of a subsidiary, the Court of Claims in *Missouri Pacific* announced a rule that applied to exchanges involving "shares of its own stock or stock of its subsidiaries." 433 F.2d at 1325.

The Tenth Circuit had occasion to consider bond discount in a bonds-for-property situation in Atchison, Topeka and Santa Fe Ry. Co. v. United States, *su-*

---

10. Taxpayer was reorganized pursuant to a plan approved by the ICC and its trustee under Sec. 77 of the Federal Bankruptcy Act. Collateral trust notes, first mortgage 4¼% bonds, general mortgage 4¾% income bonds, 5%, 90-year debentures and stock was issued for its own outstanding debt securities and stock of its subsidiaries. The difference in the aggregate maturity value of the new bonds and the fair market value of the old securities given in exchange was claimed by the taxpayer to be amortizable over the life of the bonds as original issue discount.

*pra.*[11] The fact that the Regulation concerning bond discount does not distinguish between bonds issued for cash and bonds issued for property was held to be a *sub silentio* recognition that discount could exist in both cases. Recognition of such a situation was thought to most conform the law with economic and business reality. The heavy burden of proof was satisfied by "substantial evidence from experts in railroad securities and properties who relied on the documents surrounding the reorganization, market conditions and actual trading, and valuation of the railroad properties." 433 F.2d at 153. Since a bonds-for-property exchange was at issue, the court saw a conflict in the Third Circuit opinions of *American Smelting* and *Montana Power*. The earlier view of *American Smelting* was regarded as the more persuasive.

The most recent Court of Claims pronouncement in the bonds-for-stock area is St. Louis-San Francisco Ry Co. v. United States, *supra*.[12] There, *Erie Lackawanna* and *Missouri Pacific* were regarded as binding authority. Original consideration value was not an issue, however, since the taxpayer did not contend that the maturity value of the debentures exceeded the amount it received when it issued the preferred stock. In discussing *Erie Lackawanna*, the court concluded that that case had "rejected the use of fair market value as a *determinative* measurement of debt discount

when bonds were exchanged for preferred stock." (emphasis added) 444 F.2d at 1105. The key element in that case was the value to the corporation of the stock received in the exchange. *Missouri Pacific* was also held to have rejected market value alone as determinative of the value of stock in favor of a consideration of all relevant information, including the market value, the financial conditions of the taxpayer, profit prospects and expert opinion. No trial was necessary, however, since a valuation of the shares had already been made.

Besides *Southern Fertilizer*, the other decision by a District Court in the Fifth Circuit which has addressed the issue is Claussen's Inc. v. United States, *supra*.[13] No claim was made in that case, nor proof offered, concerning market value. Instead, the taxpayer deducted the difference between the face value of the debentures and the value received for the exchanged upon issuance as amortizable bond discount. The court allowed the full discount, saying that the fact that the exchange is for the stock of the issuer rather than for cash is of no importance. *Missouri Pacific, Cities Service* and *Erie Lackawanna* were cited in holding that the measure of the bond discount is the difference between the par value of the bonds issued and the value of the stock to the taxpayer at the time of the exchange.

11. Taxpayer was formed as the successor company to receive the assets of the old company pursuant to a court ordered sale of the assets during the course of a bankruptcy reorganization. The trial judge ruled that taxpayer issued bonds and securities in exchange for the bonds and securities of the old company. The issue on appeal was not the nature of the transaction—bonds for bonds or bonds for property—but only discount can arise in any bonds-for-property transaction.

12. In 1956, taxpayer exchanged its Series A, 5%, $100 par value income debentures, maturing on Jan. 1, 2006, plus cash and common stock for its outstanding Series A, 5%, $100 par value preferred stock. The transaction was considered a reorganization under Sec. 368(a) (1) of the Internal Revenue Code of 1954—a re-

capitalization under Sec. 368(a) (1) (E). Amortizable bond discount was claimed for the difference between the fair market value of the preferred stock and the maturity value of the debentures.

13. Taxpayer issued two classes of common stock in 1954. In 1956 the shareholders approved a plan of recapitalization whereby each share of the outstanding common stock would be exchanged for ⅛ new share of common stock, a warrant to purchase ⅔ of a share of new common stock at $5.50 per share and a 6%, $10 debenture maturing in 40 years. The par value of the assets given to the old stockholders was $2,325,000. The value received for the A and B stock at issuance was $1,962,500. The difference of $362,500 was claimed as amortizable bond discount.

The Tax Court entered the fray concerning bonds-for-stock exchanges in the recent opinion of National Alfalfa Dehydrating and Milling Co. v. Commissioner, *supra*.[14] Citing *Erie Lackawanna* and *Missouri Pacific*, the decision appears to limit inquiry concerning value to the amount received by the taxpayer when the original stocks or bonds were issued. Further, the reasoning of the court harkened back to the "mere reshuffling of assets" viewpoint by characterizing the exchange from the corporation's standpoint as "merely the exchange of one form of interest . . . for another." 40 L.W. at 2245. The Tenth Circuit opinion of *Atchison, Topeka and Santa Fe* was distinguished because in that case the only issue was whether bond discount could arise in a bond-for-property exchange and not whether the value of stock was to be measured by the fair market value or by the consideration received at issuance.

The court, in reaching a decision in this matter, notes initially that it is not called upon to consider bond discount in a bonds-for-property transaction. The decisions dealing with this type of exchange, namely, Montana Power Co. v. United States, 232 F.2d 541 (3rd Cir. 1956), Montana Power Co. v. United States, 159 F.Supp. 593, 141 Ct.Cl. 620 (1958), Nassau Lens v. Commissioner of Internal Revenue, 308 F.2d 39 (2nd Cir. 1962), and Atchison, Topeka and Santa Fe Ry. Co. v. United States, 443 F.2d 147 (10th Cir. 1971), therefore are inapposite to the present considerations.

■ This court is convinced that an exchange of a corporation's income debentures for its outstanding preferred stock is more than a "mere reshuffling of assets." Instead, a very basic transformation has occurred in the capital structure of the corporation. A creditor, with full rights, has been substituted for what had previously been one with owner interest in the company. An obli-

gation to pay the face amount of the debentures plus the interest rate has been created from what once was a discretionary power depending only upon earnings and the good faith of management. Also, from the corporation's standpoint, a deductible yearly expense has been substituted for non-deductible dividend payments.

■ Since some transformation of the capital structure has occurred in both a bonds-for-cash exchange and a bonds-for-stock exchange, the court sees no reason why bond discount should occur in one and not the other. However, the court is not convinced that the market price should be the determinative measurement of bond discount. To the contrary, the arguments of Cities Service Co. v. United States, *supra*, are deemed the more persuasive. The issue price is the value assigned by the corporation to the stocks that it issues. Because of subsequent events in the marketplace which may tend to devalue the stocks, the corporation attempts through bond discount to assign a new value to the stocks. In so doing, the corporation is attempting to make use of losses which have been borne by its shareholders in the marketplace, thus, in essence, utilizing the loss a second time. This the court is unwilling to allow. In this line of thinking, the court joins with several previous decisions. *See*, Erie Lackawanna Ry Co. v. United States, 422 F.2d 425, 190 Ct.Cl. 682 (1970); Missouri Pacific Ry. Co. v. United States, 433 F.2d 1324 (Ct.Cl. 1970); Claussen's Inc. v. United States, 71–2 U.S.T.C. 9632 (S.D.Ga. July 29, 1971); Cities Service v. United States, 316 F.Supp. 61 (S.D.N.Y.1970); National Alfalfa Dehydrating and Milling Co. v. Commissioner, 57 T.C. 46 (1971).

The decisions of *Erie Lackawanna*, as explained by *Missouri Pacific* and *St. Louis-San Francisco Ry. Co.*, and of *Cities Service* are further followed to

14. In a 368(a) (1) (E) recapitalization, taxpayer exchanged bonds with a face value of $50 for preferred stock with a par value of $50 and cancelled the stock after the exchange. Taxpayer claimed the difference of face value and fair market value as amortizable bond discount.

the extent that proof of market value is considered important in establishing that the value of the stock to the corporation might be greater than the issue price. Since the only value in the facts now before the court is the stated price of the stock, a hearing is necessary to make a determination as to the correct fair market value of the stock at the time of the exchange. According to *Cities Service*, the original issue price of the stock must be ascertained as well.

Several of the previously discussed cases are distinguishable from the present one and thus not in conflict with it. There was no original issue price in *American Smelting* because the exchanging corporation received the shares of a wholly-owned subsidiary. Therefore, the market value was the only one with which the court could measure bond discount. Similarly, *Southern Fertilizer* and *St. Louis-San Francisco Ry. Co.* did not consider the issue price. In the former case, the value of the stock was stipulated and in the latter, the taxpayer did not contend that the maturity value of the debentures exceeded the amount it received when it issued the preferred shares. The rationale of *Southern Natural Gas* also is of no consequence because here the stock received in the exchange was retired. The pivotal point in *Southern Natural Gas* was that the stock was retained and so could not be valued.

Therefore, pursuant to Rule 56(d), F. R.Civ.Proced., it is hereby Ordered, Adjudged, and Decreed that no genuine issues exist as to the plaintiff's claim except as indicated. The measurement of bond discount shall be the difference between the issue price originally received by taxpayer for the preferred stock and the par value of the bonds, except if it can be shown that the fair market value of the preferred stock at the time of the exchange was greater than the issue price. Then, the bond discount shall be the difference between the fair market value of the preferred stock and the par value of the bonds. Provided however, that no bond discount shall exist if either the issue price or the fair market value of the preferred stock exceeds the par value of the bonds. Evidence as to the issue price of the preferred stock and the fair market value of the preferred stock shall be received by this court after which time a determination as to bond discount shall be made.